IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| MARCEL YONAN, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 09 C 4280 |
| v. | ) ) | |
| UNITED STATES SOCCER FEDERATION, INC. | ) ) ) ) | Judge Virginia M. Kendall |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Marcel Yonan ("Yonan") is a soccer referee and lawyer. In 2007, defendant United States Soccer Federation, Inc. ("the Federation") told Yonan, then 50 years old, that he would not be assigned to work Major League Soccer ("MLS") games. He sued, alleging age discrimination in violation of the Age Discrimination in Employment Act ("ADEA") (29 U.S.C. § 621 *et seq*.) and retaliation. The Federation moved for summary judgment (Doc. 52), asserting that Yonan is an independent contractor not protected by the ADEA. According to the Federation, even if Yonan was an employee, Yonan cannot establish his ADEA and retaliation claims. For the reasons below, the Court does not reach the issue of whether the Federation fired Yonan because of his age because it finds Yonan is not an employee of the Federation and not protected by the ADEA. Consequently, the Federation is entitled to summary judgment.

## I. MATERIAL UNDISPUTED FACTS[1]

### A. The Federation and Soccer Refereeing

The Federation is the statutory body that governs soccer in the United States. (Yonan 56.1 Resp. ¶ 3; Yonan Dep. 31.)[2] The Federation registers, trains and certifies referees to officiate in Federation games, which include national and international games as well as games for youth and professional leagues affiliated with the Federation. (Yonan 56.1 Resp. ¶¶ 4, 22.) Those professional leagues include the United Soccer League ("USL") and MLS. (*Id.*) Referees who want to officiate Federation-affiliated games must register with the Federation each year and pay a registration fee. (*Id.* ¶ 5.) Referees are certified at different grade levels depending on their ability and experience. (*Id.* ¶ 6.) To maintain certification as a national referee, a referee must fulfill certain annual requirements including a physical endurance test and a written test on the International Federation of Association Football's ("FIFA") Laws of the Game. (*Id.* ¶¶ 18-19.) National referees are invited to an annual camp to complete these tests. (*Id.* ¶ 19.) Provided that the referee passes the tests, individual test scores do not factor into referee assignment decisions for particular games. (*Id.* ¶ 20.)

---

[1] Yonan did not respond properly to the Federation's Local Rule 56.1 statement of material undisputed facts, choosing to put extra facts in his responses to the Federation's facts. Yonan should have put those extra facts in a separate statement of additional facts so that the Federation could respond to them with its reply. *See* L.R. 56.1(b)(3)(C) (requiring "a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon.") The Federation urges the Court to strike these additional facts and only accept the portions of Yonan's responses that respond to the Federation's facts. Formal striking is unnecessary - the record is largely undisputed on the employee vs. independent contractor issue and the Court has ignored those additional facts where Yonan relies on them. *See Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (finding "[b]ecause of the important function local rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance with those rules.")

[2] Though Yonan denied the details of the Federation's statement on this point, he testified at his deposition that the Federation is "the statutory body which governs the sport of soccer in the United States." (*See* Doc. 55-1, Yonan Dep. 31.)

Federation-registered referees are free to accept or decline the Federation's assignments for any reason. (*Id.* ¶ 25.) They also can officiate games not affiliated with the USSF, such as college and high school games. (*Id.* ¶ 27.) Almost all Federation-registered referees who work MLS games also work college games without penalty from the Federation. (*Id.*) When they work college games, the home team pays the referee his or her fees and expenses. (*Id.*) Referees who want to officiate college games must register with, and be certified by, a separate organization called NISOA. (*Id.* ¶ 28.) The Federation does not provide any offices or facilities to referees - their "workplace" which is the playing fields, which is generally not owned by the Federation. (*Id.* ¶ 53.).

During the time Yonan was a referee, before most professional and international games, a Federation referee "assessor" would contact him to provide his perspective on the teams and players. (*Id.* ¶ 47.) Those discussions were for the benefit of the referees and designed to enhance their performance during the game. (*Id.* ¶ 48.) MLS also hosted conference calls involving Federation officials to assist referees in officiating MLS games, to ensure that referees were applying the Laws of the Game consistently, and to enhance MLS's credibility. (*Id.* ¶¶ 49-50.) In addition, MLS hosted a meeting for referees during its All-Star break. (*Id.* ¶ 51.) MLS published a set of guidelines for referees working MLS games that set out details like arrival times, jersey colors, expense reports, and the forms that needed to be completed post-game. (*Id.* ¶ 52.) MLS required that the referee's uniform contrast with the colors of the jerseys worn by the teams. (*Id.* ¶ 56; Yonan Dep. 151.) For other Federation-affiliated games, the referee decided what color uniform to wear, often after packing several uniforms and selecting one based on the colors used by the teams. (Yonan 56.1 Resp. ¶ 57.) Yonan asserts he had to wear a Federation blazer and tie (that he purchased) while traveling to professional games, but admitted he did not always wear the special

clothing and that he was unaware of any referee who was penalized for not doing so. (*Id.* ¶¶ 58-59.) Sportswear companies, not the Federation, gave Yonan uniforms for free. (*Id.* ¶ 54.)

Yonan was the "head referee" most of the time. (*Id.* ¶ 60.) Under the Laws of the Game, in place for all professional matches, the head referee has "full authority to enforce the Laws of the Game in connection with the match to which he has been appointed." (*Id.* ¶ 61.) The head referee has final authority over control of the match, ensuring appropriate equipment and attire is used, timing, and disciplinary action against players and coaches. (*Id.* ¶ 62.) Being a good referee requires a great deal of skill and natural ability to manage assistant referees, players and coaches in a fast-moving environment. (*Id.* ¶ 62.)

B. **Yonan's Refereeing History**

Yonan first registered with the Federation in 1982 or 1983 and rose to the rank of "national referee" in 1992, which then allowed him to work professional games. (*Id.* ¶¶ 6-7.) On his 2007 registration form, he acknowledged that he understood that registering with the Federation "does not create an employment contract or relationship with [the Federation]." (*Id.* ¶ 7.) Since first registering with the Federation, Yonan has refereed college games not affiliated with the Federation. (*Id*. ¶¶ 8, 26.)[3] The only Federation-affiliated professional leagues that Yonan has refereed were in the MLS and the USL. (*Id.* ¶ 33.) When Yonan worked those games, the leagues, not the Federation, compensated him. (*Id.* ¶¶ 34-35.) Specifically, either MLS or USL would cut a check to Yonan and issue him an IRS Form 1099 to report the income for tax purposes. (*Id.*) The leagues also paid Yonan's expenses and reimbursed him for those expenses. (*Id.* ¶ 36.) Yonan also refereed

---

[3]The testimony cited by Yonan to support his statement that college games he worked were affiliated with the Federation does not support that point. (*See* Yonan Dep. 38-39.) Later, he admits that the Federation does not assign referees for games not affiliated with the Federation, "such as intercollegiate games." (Yonan 56.1 Resp. ¶ 26; *see also* Yonan Dep. 83 ("college games are not assigned by the [Federation].").)

U.S. Open Cup games between the mid-1980s and 2006. (*Id.* ¶ 40.) Generally, the home team of those games paid Yonan and sent him a Form 1099. (*Id.*) The Federation paid Yonan to referee the occasional "regional game," armed forces game, or international game involving the U.S. national team when sponsored by the Federation. (*Id.* ¶¶ 34-35.) Referees for international games involving two foreign national teams or an international club team like Manchester United were paid by someone other than the Federation. (*Id.* ¶ 41.) In early 2007, the Federation told Yonan that he would no longer be assigned to referee MLS games. (*Id.* ¶ 66.)

### C. Yonan's Financial and Tax Records

In addition to being a soccer referee, Yonan is an attorney operating as a solo practitioner. (*Id.* ¶ 9.) He received the majority of his annual compensation from his legal practice, and he generally received less than $15,000 from refereeing. (*Id.* ¶ 45.) In his 2003-2007 tax returns, he lists his profession as a combination of "legal services" and "soccer referee" and represented that he was a self-employed "sole proprietor." (*Id.* ¶ 10.) Yonan confirmed that the representations he made on his tax returns were accurate. (*Id.*, Yonan Dep. 95-96.) Yonan has no record of ever receiving an IRS Form W-2 or 1099 from the Federation, and has never listed the Federation as an employer on his tax returns. (Yonan 56.1 Resp. ¶ 11.) Similarly, he listed himself as self-employed on mortgage and life insurance applications. (*Id.* ¶ 12.) The Federation gave Yonan liability insurance coverage while he refereed Federation games, but did not give him a general health insurance policy or any sick-pay, vacation or other benefits. (*Id.* ¶ 11, Yonan Dep. 141-42.)

## II. STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosuire materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

5

moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000).

### III. DISCUSSION

#### A. Employees v. Independent Contractors: the "Economic Realities" Test

The ADEA prohibits "an employer . . . [from] failing or refusing to hire or to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). The ADEA applies to employees but not to independent contractors. *See E.E.O.C. v. Fort Knox School Corp.*, 154 F.3d 744, 746 (7th Cir. 1998). In determining whether an individual is an employee or an independent contractor under the ADEA, the Court applies a five factor "economic realities test" inspired by agency principles. *See id.* at 747; *Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487, 492 (7th Cir. 1996). The factors are:

1. the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work;

2. the kind of occupation and nature of skill required, including whether skills are obtained in the work place;

3. responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance operations;

4. method and form of payment and benefits; and

6

5. length of job commitment and/or expectations.

*Fort Knox*, 154 F.3d at 746. Though the Court examines all five factors, "the employer's right to control is the most important when determining whether an individual is an employee or an independent contractor." *Id.* (quoting *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378-79 (7th Cir. 1991)). "The ultimate question of whether an individual is an employee or an independent contractor is a legal conclusion which involves an application of law to facts." *Fort Knox*, 154 F.3d at 746 (internal quotation and citation omitted.)

### B. Yonan Was an Independent Contractor

Because they implicate several of the five factors, it is important to discuss at the outset Yonan's unequivocal admissions that are entirely inconsistent with the position he has taken in this suit, namely, that he is an employee of the Federation. In August 2006, just six months before the Federation told him he would not be refereeing any more MLS games, Yonan told the Federation he understood that his registration did not create an "employment relationship" with the Federation. (*See* Doc. 51-1 at 55.) Perhaps even more importantly, under the risk of substantial criminal and civil penalties if he lied on his tax returns, he told the IRS every year he was "self-employed" operating as a "sole proprietor," and never listed the Federation as his employer. He said the same in a mortgage application, where any knowing misrepresentations would also subject him to criminal liability. *See* 18 U.S.C. § 1014. It is difficult, if not impossible, to reconcile these statements with his current position that he was an employee of the Federation. In any event, the five factors weigh in favor of finding that Yonan was an independent contractor, not an employee covered by the ADEA.

#### 1. Control and Supervision

5. length of job commitment and/or expectations.

*Fort Knox*, 154 F.3d at 746. Though the Court examines all five factors, "the employer's right to control is the most important when determining whether an individual is an employee or an independent contractor." *Id.* (quoting *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378-79 (7th Cir. 1991)). "The ultimate question of whether an individual is an employee or an independent contractor is a legal conclusion which involves an application of law to facts." *Fort Knox*, 154 F.3d at 746 (internal quotation and citation omitted.)

### B. Yonan Was an Independent Contractor

Because they implicate several of the five factors, it is important to discuss at the outset Yonan's unequivocal admissions that are entirely inconsistent with the position he has taken in this suit, namely, that he is an employee of the Federation. In August 2006, just six months before the Federation told him he would not be refereeing any more MLS games, Yonan told the Federation he understood that his registration did not create an "employment relationship" with the Federation. (*See* Doc. 51-1 at 55.) Perhaps even more importantly, under the risk of substantial criminal and civil penalties if he lied on his tax returns, he told the IRS every year he was "self-employed" operating as a "sole proprietor," and never listed the Federation as his employer. He said the same in a mortgage application, where any knowing misrepresentations would also subject him to criminal liability. *See* 18 U.S.C. § 1014. It is difficult, if not impossible, to reconcile these statements with his current position that he was an employee of the Federation. In any event, the five factors weigh in favor of finding that Yonan was an independent contractor, not an employee covered by the ADEA.

#### 1. Control and Supervision

Generally, "if an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to details by which the result is achieved, an employer/employee relationship is likely to exist." *Alexander*, 101 F.3d at 493 (quoting *Ost v. W. Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 439 (7th Cir 1996)). The Court must be careful to distinguish between "control[ling] the conduct of another party contracting party by setting out in detail his obligations" consistent with the freedom of contract, on the one hand, and "the discretionary control an employer daily exercises over its employee's conduct" on the other. *North Knox*, 154 F.3d at 748.

Yonan asserts that the Federation "closely supervised" his performance at each soccer game he officiated by giving him an assessor, discussing his performance, and controlling what clothes he wore while on the field and traveling. Putting aside that the Federation did not, for the most part, control what clothes he wore, the Federation did not supervise Yonan, but rather evaluated his performance after matches. That the Federation evaluated Yonan as a referee does not mean that he was an employee. There is no question that parties retaining independent contractors may judge the performance of those contractors to determine if the contractual relationship should continue. *See North Knox*, 154 F.3d at 749 ("It would be odd for someone not to take past performance into account when deciding whether to enter into a new contract.")

It is undisputed that the Federation did not control the way Yonan refereed his games. He had full discretion and authority, under the Laws of the Game, to call the game as he saw fit. *See Hojnacki v. Klein-Acosta*, 285 F.3d 544, 551 (7th Cir. 2002) (finding a doctor was not an employee because she had full discretion as to how to treat her patients); *Ost*, 88 F.3d at 439 (noting that limousine drivers could take any route they choose). In a similar vein, subjecting Yonan to

8

qualification standards and procedures like the Federation's registration and training requirements does not create an employer/employee relationship. *See Hojnacki*, 285 F.3d at 551-52 (finding no employee relationship even though the purported employer required training, participation in quality improvement meetings, and set the hours of the workday); *Ost*, 88 F.3d at 438 (constraints like calling in and out, setting rates, and requiring vehicles to be available for service at specific times "do not . . . establish an employer-employee relationship because the details concerning performance of the work" was decided by the driver); *Alexander*, 101 F.3d at 493 (finding that defendant's requirement of "on call" status and creating assignments did not make a doctor an employee).

Yonan's relationship with the Federation, as the assignor of matches, is similar to the relationship between limousine drivers and their dispatcher that the Seventh Circuit found was not an employer-employee relationship in *Ost*. *Ost*, 88 F.3d at 439. In that case, the drivers were free to work whatever days they wanted (as was Yonan), and could turn down any assignments from the dispatching company (as could Yonan). *Id.* at 438. Just as Yonan could referee non-Federation affiliated matches, the *Ost* drivers could accept assignments from other dispatching companies. *Id.* The court found "[e]ach of these facts indicates that the manner in which the drivers performed their services [for the dispatcher] was primarily within their own control." *Id*. In short, the Federation did not have the degree of control and supervision over Yonan that would suggest Yonan was an employee.

### 2. Occupation and Skill

A position that requires special skills and independent judgment weights in favor of independent contractor status. *See Alexander*, 101 F.3d at 493. Unskilled work, on the other hand, suggests an employment relationship. *See id.*; *see also Jones v. Seko Messenger, Inc.*, 955 F. Supp.

9

931, 933 (N.D. Ill.1997). Here, it is undisputed that soccer refereeing, especially at the professional and international level, requires "a great deal of skill and natural ability." Yonan asserts that it was the Federation's training that made him a top referee, and that suggests he was an employee. Though substantial training supports an employment inference, that inference is dulled significantly or negated when the putative employer's activity is the result of a statutory requirement, not the employer's choice. *See e.g.*, *North Knox*, 154 F.3d at 748 (finding state regulations giving the school district certain oversight of bus drivers did not demonstrate control of the drivers). As the Federation points out, in the Ted Stevens Olympic and Amateur Sports Act, Congress tasked the Federation with "develop[ing] interest and participation [in soccer] throughout the United States." 36 U.S.C. § 220524. As the National Governing Body for soccer, the Federation "establishes the national goals for soccer [and] is the coordinating body for amateur soccer in the United States." *See ChampionsWorld LLC v. U.S. Soccer Fed.*, *Inc.*, 726 F.Supp.2d 961, 966 (N.D. Ill. 2010) (Leinenweber, J.)[4] The Federation's power over amateur soccer is "monolithic." *Id.* (citing *Behagen v. Amateur Basketball Ass'n*, 884 F.2d 524, 529 (10th Cir. 1988)). This power necessarily includes development of skilled referees. In other words, it is doubtful that Congress intended the Federation to neglect entirely the development of referees when it told the Federation to develop "interest and participation" in soccer. This factor also weighs against an employer-employee relationship.

### 3. Responsibility for Cost of Operation

---

[4]*ChampionsWorld* concerned the question of whether the Federation has the same level of control over professional soccer that it does over amateur soccer. Even though Yonan was primarily a professional referee late in his career, the issue of whether the Federation has control over professional soccer does not change the Court's analysis as to *why* the Federation trained referees for the purposes of the *North Knox* analysis.

Under this factor, the Court asks who paid for Yonan's equipment, supplies and workplace. *See Alexander*, 101 F.3d at 492; *Sulkin v. Chicago Transit Auth.*, No. 99 C 8808, 2000 WL 1508241, at *6 (N.D. Ill. Oct. 10, 2000). Though the parties dispute exactly who paid for Yonan's uniforms, it is undisputed that the Federation did not pay for them. Yonan bought his own shoes, whistles and cards, and he paid his own registration fee. The Federation only paid for Yonan's travel expenses when he refereed Federation-sponsored games. The individual leagues or one of the teams paid them otherwise. This factor also weighs in favor of Yonan being an independent contractor.

### 4. Method and Form of Payment and Benefits

The fourth factor, how Yonan received his pay and benefits, strongly demonstrates he was an independent contractor, not an employee. He was not paid by the Federation, except for individual games sponsored by the Federation. Rather, he was paid by the leagues and teams running the games he worked, and compensated on a per-game basis. *See Ost*, 88 F.3d at 438 (noting that the drivers were paid by passengers, not the dispatching company); *Fort Knox*, 154 F.3d at 750 (finding per-mile compensation for school bus companies supported independent contractor status for the drivers). Again, he treated himself like an independent contractor for tax purposes. *See id.* (alleged employees treated themselves as sole proprietors on their tax returns indicating independent contractor status). The teams and leagues that paid him took the same tax position, issuing him Form 1099s consistent with independent contractor status, not W-2s, which would be consistent with employment. *See id.*

Yonan offers *Worth v. Tyer*, 276 F.3d 249 (7th Cir. 2001) for the proposition that the Seventh Circuit has found employment relationships even when the plaintiff's tax records indicate "freelance" work. In *Worth*, the defendants sought a new trial or judgement as a matter of law,

11

asserting the plaintiff was an independent contractor. *Id.* at 262. One of plaintiff's tax returns listed income from the defendant as "freelance" work. *Id*. at 261. The court, applying the "clear error" standard of review, found there was sufficient evidence to find the plaintiff was an employee. *Id.* at 265. This case is much more similar to *Fort Knox* than *Worth*. Specifically, the tax return in *Worth* was a single year return after a very brief alleged employment. *Id.* The court pointed out that the plaintiff had testified that her tax preparer had made the determination that the work was freelance. *Id*. at 264. Moreover, the plaintiff in *Worth* expected to have taxes and the costs of benefits taken out of her paychecks. *Id.* Yonan, in contrast to the *Worth* plaintiff, offers no explanation why several years of tax returns were consistently the kind equated with independent contractor status and not the kind indicating an employee relationship with the Federation. The Court cannot ignore the admissions in these forms. *See Worth*, 276 F.3d at 264 (holding how a plaintiff is paid is relevant to whether he or she is an independent contractor); *Fort Knox*, 154 F.3d at 750 (same).

### 5.     Length of Job Commitment

Yonan suggests his 25-year career as a Federation-affiliated referee demonstrates he was an employee. In general, "long term, exclusive relationships are consistent with employer-employee status" whereas non-exclusive arrangements indicate independent contractor status. *See e.g., Sulkin*, 2000 WL 1508241, at *7 (citing *Alexander*, 101 F.3d at 493 and noting the plaintiff had worked for two other companies while working for the defendant). While the Federation may not have allowed Yonan to work professional games that were not Federation-affiliated, it is undisputed he could work, and in fact worked, games not affiliated with the Federation. He could also refuse the Federation's assignments. Further, his 25-year career was really a series of one-year terms, because

he was required to register with the Federation every year in order to be assigned work by the Federation. Had he not registered, he would not have been assigned any games. This factor also weighs in favor of finding Yonan was an independent contractor.

## IV. CONCLUSION

In short, all five factors indicate that Yonan was an independent contractor for the Federation, not an employee. For the foregoing reasons, the Court grants USSF's motion for summary judgment (Doc. 52) and enters final judgment for the Federation under Rule 58.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: June 22, 2011